Bryan Caforio (261265)
bcaforio@susmangodfrey.com
Chelsea Samuels (315257)
csamuels@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone:   (310) 789-3100
Facsimile:   (310) 789-3150

*Attorneys for Plaintiff CIP Jardinette Holding, LLC*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CIP JARDINETTE HOLDING, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>READYCAP COMMERCIAL, LLC, a Delaware limited liability company,<br><br>    Defendant. | Case No. 2:20-cv-2796<br><br>**COMPLAINT FOR:**<br><br>**1. Breach of Contract**<br>**2. Breach of Covenant of Good Faith and Fair Dealing**<br>**3. Breach of Unfair Competition Law § 17200 et seq.** |

7149811/016501

Plaintiff CIP Jardinette Holding, LLC ("Plaintiff"), by and through its attorneys Susman Godfrey L.L.P., as and for its Complaint against Defendant ReadyCap Commercial, LLC ("Defendant" or "ReadyCap"), alleges as follows:

## NATURE OF THE ACTION

1. On or around December 21, 2017, CIP Jardinette entered into an $8.8 million loan agreement with ReadyCap ("Loan Agreement") to recapitalize and renovate a multi-family apartment building located at 5128 Marathon St., Hollywood, California 90038 ("Marathon Project").

2. The Loan Agreement specifically required that ReadyCap would advance millions of dollars to CIP Jardinette on or before May 10, 2019, in order to provide the necessary funds for CIP Jardinette to complete the Marathon Project.

3. In specific reliance on the existence of the Loan Agreement, CIP Jardinette invested millions of dollars into the Marathon Project. Although ReadyCap had specific knowledge that the purpose of the Loan Agreement was to provide the funding necessary for CIP Jardinette to renovate the apartment building in order to sell for a profit, ReadyCap breached its contractual obligations to CIP Jardinette and failed and refused to provide the contractually required funds necessary for CIP Jardinette to complete the Marathon Project.

4. Instead, and in direct contravention of the clear contractual provisions it purported to rely upon, ReadyCap erroneously asserted that CIP Jardinette had defaulted on its loan obligations, notwithstanding the undisputed fact that CIP Jardinette complied with all required contractual terms on or before May 10, 2019.

5. ReadyCap used its erroneous finding that CIP Jardinette was in default to willfully withhold millions of dollars in funding necessary for CIP Jardinette to complete the Marathon Project.

7149811/016501

6. As a direct, proximate, and foreseeable result of ReadyCap's contractual breaches, CIP Jardinette suffered millions of dollars in harm as the Marathon Project stalled and ultimately collapsed.

7. Through this action CIP Jardinette seeks declaratory relief, compensatory damages, incidental damages, consequential damages, lost profits, penalties, punitive damages, attorney's fees, costs, and other appropriate legal and equitable relief pursuant to all applicable laws.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over CIP Jardinette's claim pursuant to 28 U.S.C. § 1332.

9. This Court has personal jurisdiction over ReadyCap because ReadyCap operates in California and conduct giving rise to Plaintiff's claims occurred in this District.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) because the events giving rise to Plaintiff's causes of action occurred in this District, and the property at issue in this dispute is located in this District.

## THE PARTIES

11. Plaintiff CIP Jardinette is a Delaware limited liability company with its principal place of business at 1005 A Street, Suite 406, San Rafael, California 94901. CIP Jardinette's manager and 89% owning primary member is Ratel Hollywood LP, a California limited partnership.

12. Ratel Hollywood is a real estate investment firm that focuses on creating and preserving wealth by investing in multi-tenant properties in strong local markets with correctable cosmetic flaws.

13. Defendant ReadyCap Commercial, LLC is a Delaware limited liability company with its principal place of business at 1320 Greenway Drive, Suite 560, Irving, Texas 75038.

7149811/016501

## FACTUAL BACKGROUND

14. In 2016, CIP Jardinette began considering purchasing a multi-tenant apartment building in Los Angeles, California, in order to renovate and resell the property.

15. CIP Jardinette purchased a multi-tenant apartment complex located at 5128 Marathon Street, Los Angeles, CA 90038 on April 18, 2016, and started taking steps to renovate the property, including by appointing Robert Clippinger as the initial manager of CIP Jardinette to oversee the Marathon Project.

16. After purchasing the Marathon property, CIP Jardinette began negotiating with different lenders to receive financing to pay off the initial mortgage on the property and to secure additional financing necessary to complete the renovation.

17. Ratel Hollywood is a real estate investment firm with an established track record of targeting reasonably priced multi-tenant buildings for purchase, renovating those properties, and selling them at a substantial profit.

18. At the same time CIP Jardinette was looking for new potential lenders, Ratel Hollywood was investigating potential renovation projects in which to invest.

19. After conducting extensive research and analysis, Ratel Hollywood decided to invest in the Marathon Project and extensively renovate the property in order to sell the property at a significant profit.

20. On December 21, 2017, Ratel invested approximately $4 million into the Marathon Project in order to become the 89% owner of CIP Jardinette Holding, LLC, a single purpose entity.

21. On that same date, December 21, 2017, CIP Jardinette entered into a loan agreement with ReadyCap. Pursuant to the Loan Agreement, ReadyCap agreed to loan to CIP Jardinette up to $8,815,000 for CIP Jardinette to complete the Marathon Project and renovate the apartment complex.

3

7149811/016501

22. The full Loan Agreement is attached hereto as Exhibit 1.

23. In order to provide the liquidity necessary for CIP Jardinette to complete the Marathon Project, Section 2.1(b) of the Loan Agreement required that ReadyCap provide CIP Jardinette the entire "Mandatory Advance Amount" on or before May 10, 2019, "provided no Event of Default has occurred."

24. Section 8 of the Loan Agreement identifies specifically delineated occurrences that qualify as an "Event of Default."

25. In the months leading up to October 2018, CIP Jardinette started having concerns that Clippinger was not the best fit to serve as the Project Manager overseeing the Marathon Project. During that time frame, CIP Jardinette, through Ratel, had multiple communications with ReadyCap in which it informed ReadyCap about the bases for its concerns, including some accounting irregularities, decreased cash reserves, and missed construction deadlines.

26. Accordingly, in October 2018 Ratel, as the 89% owner of CIP Jardinette, provided notice to ReadyCap that it intended to remove Clippinger as manager from the project and have Ratel assume the role of Manager so that the Marathon Project could continue moving forward as scheduled and remain a profitable enterprise.

27. Notwithstanding ReadyCap's contractual obligation to not "unreasonably with[o]ld" consent to CIP Jardinette inserting a new Manager to oversee the project under Section 5.4(a)[1], ReadyCap sent a letter to Ratel Hollywood on October 18, 2018, in which it

---

[1] Section 5.4 of the Loan Agreement covers the contractual provisions regarding the "Management of the Property," and provides:

(a) The Property will be managed at all times by the Manager pursuant to the Management Agreement unless terminated as provided in the Loan Documents. Borrower shall diligently perform all terms and covenants of the Management Agreement. Borrower shall not (a) surrender, terminate, cancel, or materially modify the Management Agreement, (b) enter into any other agreement relating to the management or operation of the Property with Manager or any other Person, (c) consent to the assignment by Manager of its interest under the Management Agreement, or (d) waive or release any of its rights

4

erroneously claimed that removing Clippinger as Manager "would constitute a Transfer under the terms of the Loan Documents, which may not occur without the Lender's prior express written approval, and which approval may be given or withheld in the Lender's sole and absolute discretion."

28.     In order to qualify as a "Transfer" under the Loan Agreement, however, there must be "a conveyance, transfer, sale, assignment, equity pledge or Lien" on the Property.[2] At no point did CIP Jardinette carry out a conveyance, transfer, sale, assignment, equity pledge, or lien on the Property, however. Instead, it simply sought approval to substitute Ratel in for Clippinger as Manager without changing any entity's ownership interest in the property. That

---

(… cont'd)

and remedies under the Management Agreement, in each case, without the consent of Lender, which consent shall not be unreasonably withheld or delayed. If at any time Lender consents to the appointment of a new manager (including, but not limited, in connection with the Ratel Member's removal of the Guarantor as manager of the Sole Member pursuant to Section 5.4(b) below), such new property manager and Borrower shall, as a condition to Lender's consent, execute a subordination of management agreement in form and substance reasonably satisfactory to Lender.

(b)     If at any time and. for any reason, the Guarantor is removed by the Ratel Member (pursuant to and in accordance with the terms, provisions, covenants and conditions of the Sole Member's Operating Agreement), or otherwise, as the manager of the Sole Member, then: (i) the Ratel Member, acting on behalf of the Sole Member, shall promptly cause Borrower to enter into a new property management agreement relating to the management and operation of the Property with a new Manager acceptable to Lender, in its commercially reasonable discretion; and (ii) the Ratel Member (or an Affiliate thereof acceptable to Lender) shall execute and deliver to Lender a replacement Guaranty of Recourse Obligations in favor of Lender.

[2] The Loan Agreement defines "Transfer" to mean:

(a) Any conveyance, transfer, sale, assignment, equity pledge or Lien, whether by operation of law or otherwise, of, on or affecting (i) all or any portion of the Property, or (ii) any direct or indirect legal ownership interest in Borrower, and (b) any change in Control of Borrower (including, but not limited to, any transfer of any direct or indirect legal ownership interest in Borrower that results in Guarantor owning less than on quarter of one percent (0.25%) direct or indirect ownership interest in, and/or not having effective legal and management control of, Borrower and the Property.

5

action did not constitute a conveyance, transfer, sale, assignment, equity pledge or lien, and thus did not and could not qualify as a Transfer under the Loan Agreement.

29. CIP Jardinette initially believed that ReadyCap had simply made an error, so it sent correspondence back to ReadyCap identifying the contractual definition of "Transfer" to clear up any confusion.

30. Rather than acknowledge its error, however, ReadyCap doubled down and in bad faith declared that CIP Jardinette defaulted under the Loan Agreement because it: (1) engaged in a "prohibited transfer" by removing Clippinger as Manager; (2) improperly terminated Clippinger as Manager under Section 5.4(a); and (3) improperly terminated Clippinger as Guarantor under Section 5.4(b).

31. In reality, CIP Jardinette had satisfied all of its affirmative obligations under the Loan Agreement, did not violate any of those provisions, and therefore was not in default under the Loan Agreement.

32. Section 8.1 of the Loan Agreement identifies the limited events that qualify as an "Event of Default," which specifically does not include a violation of Section 5.4(a) or 5.4(b)—which Plaintiff did not breach in any event.

33. Section 8.1(d) does identify "the occurrence of a Transfer, other than a Permitted Transfer" as an Event of Default, but removing the project manager does not qualify as "Transfer" under the Loan Agreement because substituting out Clippinger did not result in "a conveyance, transfer, sale, assignment, equity pledge or Lien" on the Property. Accordingly, there was no Default and ReadyCap breached the Loan Agreement and acted in bad faith by declaring an erroneous default in order to exact more fees from CIP Jardinette rather than fulfill its obligations under the Loan Agreement.

34. Once ReadyCap erroneously determined that CIP Jardinette was in default, it essentially shut down the Marathon Project: (1) it stopped communicating with Ratel or CIP

6

7149811/016501

Jardinette directly and instead only communicated through its agent and special servicer, LNR Partners; (2) it refused to advance the required mandatory advance funds on or before May 10, 2019, which were necessary to continue renovating the project; and (3) it unreasonably refused to approve CIP Jardinette's request under Section 5.4(a) to appoint Ratel as the new Manager of the project.

35. ReadyCap's contract breaches were in bad faith and had disastrous consequences for the Marathon Project.

36. Although Ratel, through CIP Jardinette, attempted to move forward with completing the Marathon Project, without access to the contractually mandated funds, it was unable to complete the necessary renovations on the Property.

37. Additionally, because ReadyCap erroneously declared that CIP Jardinette was in default and initiated steps to begin the foreclosure process, CIP Jardinette was unable to obtain financing from any other lending source as no other bank that CIP Jardinette communicated with was willing to loan funds for the Marathon Project with the potential cloud of foreclosure hanging over the apartment complex.

38. Throughout 2019, Ratel sent countless communications to ReadyCap and its agent LNR Partners in which it demonstrated that ReadyCap was breaching the Loan Agreement and misconstruing ReadyCap's contractual obligations in bad faith. Ratel also repeatedly sought approval to serve as Manager of the Marathon Project and receive access to the funds necessary to salvage the project – all to no avail.

39. Over that entire time period Ratel and CIP Jardinette satisfied all required obligations under the Loan Agreement and took all steps possible to mitigate the losses and continue with the project.

7

40. Due to ReadyCap's failure and refusal to comply with its obligations under the Loan Agreement, the Marathon Project collapsed and the apartment complex is set to be sold through a Receiver-controlled auction at a substantial loss.

41. In total, CIP Jardinette and Ratel lost millions of dollars in direct out of pocket costs and lost profits as a direct and foreseeable consequence of ReadyCap's multiple breaches.

## **FIRST CAUSE OF ACTION**

(**Breach of Contract**)

(Against ReadyCap Commercial, LLC)

42. CIP Jardinette incorporates by reference paragraphs 1 to 41 above as though fully set forth herein.

43. CIP Jardinette and ReadyCap entered into the Loan Agreement on December 21, 2017.

44. CIP Jardinette performed all significant things required of it under the Loan Agreement.

45. ReadyCap breached the Loan Agreement and failed to satisfy its obligations under the Loan Agreement in numerous ways, including by failing to deposit the Mandatory Advance Amount for use by CIP Jardinette to complete the Marathon Project on or before May 10, 2019, as required under Section 2.1(b), unreasonably refusing to consent to Ratel substituting Ratel Hollywood in for Clippinger as the project manager pursuant to Section 5.4(a), and declaring the loan in default when no Event of Default occurred.

46. As a direct and proximate result of ReadyCap's breach of contract, CIP Jardinette has been substantially harmed as it has lost millions of dollars in direct out of pocket costs and lost profits.

47. As a direct and proximate result of ReadyCap's breach of contract, CIP Jardinette was unable to obtain alternative funding from other lending sources to complete the Marathon

Project. ReadyCap knew of the purpose of Loan Agreement and knew that by withholding the Mandatory Advance Amount and erroneously declaring CIP Jardinette in default that CIP Jardinette would be unable to complete the Marathon Project as planned and thereafter sell the renovated apartment complex for a substantial profit.

48. ReadyCap's breach of contract was a substantial factor in causing CIP Jardinette's harm.

## SECOND CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

(Against ReadyCap Commercial, LLC)

49. CIP Jardinette incorporates by reference paragraphs 1 to 48 above as though fully set forth herein.

50. CIP Jardinette and ReadyCap entered into the Loan Agreement on December 21, 2017.

51. CIP Jardinette did all or substantially all of the significant things the Loan Agreement required CIP Jardinette to do.

52. All conditions required for CIP Jardinette to perform under the Loan Agreement had been satisfied.

53. ReadyCap unfairly interfered with CIP Jardinette's right to receive the benefits of the Loan Agreement by misconstruing and misapplying the definition of "Transfer" in the Loan Agreement and thereby failing to deposit the Mandatory Advance Amount as required under the Loan Agreement.

54. ReadyCap unfairly interfered with CIP Jardinette's right to receive the benefits of the Loan Agreement by unreasonably withholding consent to substitute Ratel Hollywood for Clippinger as the Project Manager.

55. ReadyCap unfairly interfered with CIP Jardinette's right to receive the benefits of the Loan Agreement by erroneously declaring that CIP Jardinette was in default even though no Event of Default occurred.

56. By doing so, ReadyCap did not act fairly or in good faith.

57. As a direct and proximate result of ReadyCap's breach of contract, CIP Jardinette was unable to obtain alternative funding from other lending sources to complete the Marathon Project. ReadyCap knew of the purpose of Loan Agreement and knew that by withholding the Mandatory Advance Amount and erroneously declaring CIP Jardinette in default that CIP Jardinette would be unable to complete the Marathon Project as planned and thereafter sell the renovated apartment complex for a substantial profit.

58. As a direct and proximate result of ReadyCap's breach of contract, CIP Jardinette has been substantially harmed as it has lost millions of dollars in direct out of pocket costs and lost profits.

### THIRD CAUSE OF ACTION

(**Violation of the Unfair Competition Law, Cal. Bus. & Profs. Code § 17200,** *et seq.*)

(Against ReadyCap Commercial, LLC)

59. CIP Jardinette incorporates by reference paragraphs 1 to 58 above as though fully set forth herein.

60. Beginning at an exact date unknown to Plaintiff but at least since October 18, 2018, ReadyCap has committed unfair business acts or practices, as defined by Business and Professions Code section 17200, by engaging in the following practices:

    (i) ReadyCap unfairly interfered with CIP Jardinette's right to receive the benefits of the Loan Agreement by misconstruing and misapplying the definition of "Transfer" in the Loan Agreement and thereby failing to deposit the Mandatory Advance Amount as required under the Loan Agreement;

10

7149811/016501

        (ii)    ReadyCap unfairly interfered with CIP Jardinette's right to receive the benefits of the Loan Agreement by unreasonably withholding consent to substitute Ratel Hollywood for Clippinger as the Project Manager; and

        (iii)    ReadyCap unfairly interfered with CIP Jardinette's right to receive the benefits of the Loan Agreement by erroneously declaring that CIP Jardinette was in default even though no Event of Default occurred.

61. These acts and practices, as described in paragraph 60 above, violate Business & Professions Code section 17200 in the following respects:

        (i)    The harm to CIP Jardinette and to the general public outweigh the utility of ReadyCap's policy/practice and, consequently;

        (ii)    ReadyCap's practice of unfairly misconstruing the terms of the loan, taking CIP Jardinette's origination fees and money, and refusing to give CIP Jardinette anything in return constitutes an unfair business act of practice within the meaning of Business and Professions Code section 17200.

62. The unfair business practices of ReadyCap, as described above, present a continuing threat to members of the public in that the entire lending industry would collapse if lenders were allowed to act in the manner described above with impunity.

63. As a direct and proximate result of ReadyCap's wrongful conduct, CIP Jardinette was unable to obtain alternative funding from other lending sources to complete the Marathon Project. ReadyCap knew of the purpose of Loan Agreement and knew that by withholding the Mandatory Advance Amount and erroneously declaring CIP Jardinette in default that CIP Jardinette would be unable to complete the Marathon Project as planned and sell the renovated apartment complex for a substantial profit.

11

7149811/016501

64. As a direct and proximate result of ReadyCap's wrongful conduct, CIP Jardinette has been substantially harmed as it has lost millions of dollars in direct out of pocket costs and lost profits.

65. As a result of the aforementioned facts, CIP Jardinette has lost money or property or suffered injury in fact. ReadyCap received and continues to hold direct out of pocket costs belonging to plaintiff CIP Jardinette.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CIP Jardinette prays for judgment in his favor and against Defendant ReadyCap Commercial, LLC as follows:

(a) A money judgment for all out of pocket losses caused by ReadyCap's wrongful conduct with interest at the maximum legal rate;

(b) A money judgment for all lost profits CIP Jardinette could not receive as a direct and proximate result of ReadyCap's wrongful conduct with interest at the maximum legal rate;

(c) Injunctive relief;

(d) Compensation for litigation costs, expert witness fees, and attorneys' fees;

(e) An award of punitive damages; and

(f) For such other and further relief as the Court deems proper.

Dated: March 26, 2020                         SUSMAN GODFREY L.L.P.

                                              By _____
                                                  Bryan Caforio
                                                  Chelsea Samuels

                                                  *Attorneys for Plaintiff*

7149811/016501